## Taylor *v.* The State of Georgia.

1. The verdict is sustained by the evidence and the law.
2. On a trial for murder, one defence being insanity, it was not error to reject as evidence two indictments against the prisoner, for carrying concealed weapons and disturbing religious worship, and the verdicts of not guilty thereon, the trials upon which occurred several years previously, nor to reject testimony that on those trials the sole question submitted to the jury was the sanity or insanity of the defendant, and that one of the persons killed swore at those trials that defendant was insane ; it not appearing from the records of those cases that the verdicts may not have been rendered upon questions other than sanity or insanity, there having been a general plea of not guilty in each, and insanity not having been specially pleaded or relied on.
3. Knowledge of the defendant for a long time by witnesses, and his always acting like a sane man, were facts upon which they could base opinions as to his sanity.
4. Though a witness for the prisoner was not compellable to answer, on cross-examination, whether he had served a term in the penitentiary, he could do so if he chose; and the allowance of his answer in the affirmative was not error.
5. Parts of the charge complained of seem either not erroneous or favorable to the prisoner; and no error therein is specified.
6. The charge as a whole was fair and legal.
7. Testimony as to what the witness said to the prisoner's father about certain conduct of the prisoner, was immaterial.
8. Testimony that, some time previously to the killing, the witness heard the deceased say the prisoner was crazy, was inadmissible.
9. A physician who lived near the prisoner for a long time, knew him

| | |
|---|---|
| 83 | 647 |
| 102 | 322 |
| 102 | 345 |
| 83 | 647 |
| f111 | 180 |
| 83 | 647 |
| 127 | 400 |
| 127 | 817 |
| 83 | 647 |
| 129 | 72o |

well and had frequent conversations with him, could give an opinion as to whether he was sane or insane.

10. Exception to the permission of counsel for the State to make certain comments in concluding argument, without stating what the comments were, is of no avail

November 11, 1889.

Criminal law. Murder. Evidence. Insanity. Witness. Charge of court. Practice. Before Judge BOYNTON. Washington superior court. March term, 1889.

J. D. F. Taylor was indicted for the murder of W. I. Cone. The evidence for the State showed, in brief, as follows: On the day and in the county charged in the indictment, Taylor killed Cone and Dr. Robson by shooting them with a pistol. That morning, Dr. Robson and Cone got into a buggy with a witness and went to a grocery, where they staid fifteen or twenty minutes, Robson and Cone getting some whiskey. As they drove away, Robson said he wanted to go by a gin-house to see Jake Mathis; and they stopped there, not seeing Mathis at first. Robson told a negro he wanted his hogs, and was told that he would have to see Mathis and old man John Taylor. When Mathis came out, he looked mad. Dr. Robson told him if he would give him his due-bill he would pay him. He said he did not have it; he had burned it. Dr. Robson then took out a $10 bill. Mathis did not have the change, and said he was going after it. The occupants of the buggy then drove to a gate in the road running by Mathis's house, and there were met by Mathis and defendant, who had come from towards the house. Something was said about the hogs. Dr. Robson said nothing to Taylor, who, for reasons unknown, jumped up and cracked his heels together and said something not remembered by one witness; another testified that it was, "Here is hell, and a heap of it." The latter witness also testified that Robson and Cone were both drinking; that at the gin-house, Mathis said Robson could

not get off with that excuse about change, he (Mathis) had money at the house; that Robson told the negro he, old man and Mathis were trying to steal his hogs; and that at the gate witness thought there would be trouble, because he thought Mathis had told Taylor what Robson had said. Robson, Cone and the first witness drove away from the gate in the buggy. Witness was satisfied the difficulty was over. After driving about 150 yards, they stopped where two other roads led in different directions, to let Cone alight and take one of them to go homeward. Robson looked back and said, "They are following us." Nothing had been said to make them do so, nor had they been beckoned to. Robson jumped out of the buggy, and as defendant and Mathis came up, said to Mathis, "Do you want to fight?" Mathis replied in the negative, and Robson said, "Well, I don't either." Taylor told him not to pass any insinuations about him; to which Robson replied that he was not making any insinuations and did not care anything about Taylor. Thereupon Taylor shot twice at Robson and killed him, and then shot twice at Cone, who was ten or fifteen steps distant, walking off, hitting him just below the left shoulder-blade. He was probably looking backward as he walked. He died from this wound. He did not start off and come back. Nothing was said about Taylor's or his family's trying to steal hogs, nor was any such language as "d—d scoundrel" used. Neither of the witnesses referred to saw any weapon on Robson or Cone, except that Robson had a shut knife in his pocket, and when Cone was taken home there was a knife under his left hand, and the hand was under him. The horse was frightened by the firing and ran, witness still being in the buggy. After moving some distance, he drew the horse into a trot, looked back and saw defendant and Mathis going off. This witness did not

return to the scene of the homicide. The other witness saw defendant running down the road; first thought it was Mathis.

The defendant introduced Mathis, whose account of the matter was as follows: First saw Robson and Cone at the gin-house; Robson said he was ready to settle for those hogs; told him I did not have the money to change his $10, and that I had burned his due-bill because I knew it was all right; went to the house to get the change; met defendant just before I got there; we then met Cone and Robson at the gate; Cone got out of buggy and had his knife in his hand; I had not told defendant what Robson had said. They got out of the buggy three times from the front of Taylor's gate and where the shooting occurred. When they got to the trail, Cone got out, and Robson said to defendant, "You G— d—d scoundrel, I am going to kill you"; and Cone told him to go it and "I will stand by you until hell freezes." Robson kept coming and with his hand in his pocket; and defendant shot him twice. By that time Cone was in the act of cutting defendant, and he shot him. After he was shot, he walked twenty or thirty steps. Defendant had not said anything but "don't pass any insinuations on me." When he shot Robson, Cone was so near that he was cutting at him, and defendant missed him the first time, and Cone cut at him with his left hand so hard that he threw himself around, and he shot him in the back. Defendant then walked off. Cone had his knife out all the time. It is not true that he was walking off when shot. Dr. Robson asked me if I wanted to fight. When they got out of the buggy, Cone came to defendant, and Robson ran his hand in his pocket and said, "G— d—n you, I will kill you," and started to him; and defendant killed him. He had his hand in his pocket and never got it out. I never told Jesse Robson, Stanley or Dr. Allen

that I held defendant to keep him from going down the road, and that he told me if I did not let him go he would shoot me. I told them I was trying to keep down the difficulty. Made no similar statement to Archer or Jones.

Other testimony for the defence tended to show that an open knife was found near Cone's hand; that he was lying on his face with his left hand under him, and was turned over on his back at the suggestion of a witness; and that Dr. Robson, if sober, was peaceable, but if drunk, was easily made mad and dangerous. There was much evidence to show that defendant was insane, his father and brother, two doctors and other witnesses testifying on this point. He had been thrown from a wagon eight years before and hurt about the head and neck, and his mind was thereby affected. He did many strange actions, such as shooting at a ghost, going into water out of doors in the coldest weather and saying he was not cold, imagining that some one was shooting at his mother and father, and afterwards they were all down on him and he supporting them, trying to kill a little child of whom he was very fond, while playing with it, flying into a passion because it happened to strike him on the knee, leading his horse, hitched up, over fields, fences and ditches, trying to shoot his brother, imagining noises to be gunshots in his window, etc., etc. At times he was quiet and peaceable, but would have crazy spells. His father had tried to get him into the asylum at Milledgeville, but had failed because there was no room for him. He had a bad fit on the morning of the homicide. At church once, defendant suddenly pulled off his shoes and rolled up his pantaloons, and started to pull off his coat and go into the pulpit. He had been insane ever since he had the fall. He made cotton on his brother's land, but did not carry it to market. The witnesses thought he was

crazy. The doctor who attended him when he had the fall considered him a fit subject for the asylum two years afterwards, and upon the hypothesis stated by his counsel, reciting numerous peculiar actions testified to have been performed by him, would unconditionally pronounce him insane; and so would the other doctor who lived at the asylum in Baldwin county. The latter testified, however, that men are not usually insane from concussion, and they generally recover in three or four years if they live that long; that he could not say defendant would not know right from wrong, under the facts stated, some patients in the asylum being considered responsible, having lucid intervals and being skilful and attentive to business at such times, but defendant might have the capacity to attend to business and still be insane.

In rebuttal, the State introduced Stanley, J. A. Robson and Archer, who testified that Mathis, at his house the night after the killing, stated to them and others that he held defendant and tried to keep him from going to the road, and was told by him that he would shoot him if he did not turn him loose, and that he did so because he was afraid defendant would kill him; also that defendant was drunk; also that the only fuss was between himself (Mathis) and Dr. Robson, and Cone did not do anything. Half a dozen witnesses testified that they knew Mathis's general character, that it was very bad, and that they would not believe him on oath. Further testimony tended to show that defendant did not appear to be insane when sober, though his actions were strange when he was drunk; that he sold a bale of cotton the day before the killing and attended to his regular business; that he sold a machine to a witness in 1885; that he sometimes had engaged in a game of ball with others, kept the score for them, etc. On this subject Dr. Allen testified that

he had known defendant for ten or twelve years, lived three or four miles from him, had talked with him sometimes on general topics, once about a murder that had occurred, and did not notice that he was insane.

A witness introduced by the defendant testified that he was one of the coroner's jury, and heard the first witness for the State testify, and he swore that when defendant shot Robson, he was standing with his back to him. This witness further stated that Robson was shot in his leg and in the side of his head. The State's witness referred to had testified, on cross-examination, that he said Robson was shot in the back the second shot because he turned round.

The grounds for new trial are stated in the opinion, except those complaining of the charge of the court, and none of these specify any particular error. The first ground of the amendment to the motion, referred to in the fifth part of the opinion, was that the court erred in charging: "If you believe from the evidence that Cone and Robson were together, and were acting in concert, or acting with a common purpose or a common intent to do Taylor a serious personal injury, and while acting with such joint or common purpose or intent, they or either of them manifestly intended or endeavored, by violence or surprise, to commit a personal injury on Taylor amounting to a felony, and you believe that Taylor killed Cone, and killed him to prevent such injury from being inflicted on his person, then you would be authorized to return a verdict of not guilty."

J. N. GILMORE and REESE & LITTLE, by J. H. LUMPKIN, for plaintiff in error.

CLIFFORD ANDERSON, attorney-general, and O. H. ROGERS, solicitor-general, for the State.

BLANDFORD, Justice.

The plaintiff in error was indicted in the county of

Washington for murder, in that he killed and murdered one W. I. Cone. He pleaded not guilty. The jury upon the trial of the case found him guilty, and he was sentenced to imprisonment in the penitentiary for life. He thereupon moved the court for a new trial, which being denied, he prosecuted the writ of error, to have the judgment of the court below reviewed and reversed.

1. The first ground is that the verdict is strongly and decidedly against the weight of the evidence and without evidence to support the same; and the 2d ground is that the verdict is contrary to law. These are the usual grounds in motions for a new trial; and it may be sufficient to say as to them that the verdict is neither contrary to law nor to the evidence.

2. The 3d ground was strongly urged before us by counsel for the plaintiff in error. This ground alleges that the court erred in rejecting as evidence certain indictments against the defendant, one for carrying concealed weapons and the other for disturbing religious worship, each of these offences being alleged to have been committed on the—day of——, 1885, and said indictments having been tried and verdicts of not guilty rendered as to each, at the March term, 1886, of Washington superior court. The purpose of the defendant in offering these indictments in evidence was stated to be, to follow the same with proof that the sole issue submitted in each case was the sanity or insanity of the defendant. And it is also alleged as error that the court rejected the testimony of Andrew M. Mayo, when offered by the defendant, to prove that on the trial of these indictments, the sole question submitted to the jury was the sanity or insanity of the defendant; and also that the court rejected the testimony of this witness that Dr. J. H. Robson, one of the witnesses at said trials, swore that the defendant was insane.

The trials which took place upon the indictments referred to occurred several years prior to the time this homicide is alleged to have been committed. In our opinion, no conclusion can be drawn against the State in the present case by reason of what occurred upon the trial of those cases. It is true the State was by name a party to those indictments, but only by name, *pro forma;* otherwise than as representing the public, it had no interest therein. The indictments were found by a grand jury, and the prosecution was carried on by an officer of the State. So far as appears from the records of those cases, the verdict of the jury may not in fact have been upon the question of sanity or insanity. There was a general plea of not guilty as to both indictments, and insanity was not specially pleaded and relied on by the defendant in those cases; so that was not the sole issue submitted to the jury upon the trial thereof. The State may have failed to make out the case by its proof submitted against the accused upon those trials; and this would have authorized the jury to find the verdicts they did find therein. The prosecuting officer may have been negligent in procuring testimony as to the sanity of the accused, and may have failed to introduce any testimony whatever upon the question of the defendant's sanity; and no such *laches* of the State's officers can be imputed to the State as to bind the State in any subsequent case upon a trial of a case depending on other facts. It was decided by this court in the case of *Bradley* v. *Johnson, administrator,* 49 *Ga.* 412, that where an application for letters of administration had been caveated by a person who claimed to be the widow of the intestate, upon the ground that as his widow she was entitled to such administration, and a verdict was rendered against her, this did not bar her right afterwards to recover in a suit against the administrator, as the widow and only heir-at-law of

the intestate. And Chief Justice WARNER, who delivered the opinion, refers to the Duchess of Kingston's case (20 Howell's State Trials) as the leading case upon the subject. In that case the Duchess of Kingston had been indicted and was on trial before the House of Lords for bigamy. Her counsel tendered a record of the consistory court, of a case between herself and Augustus John Hervey, in which she libelled Hervey for jactitation of marriage, and in which Hervey also appeared and filed an answer claiming to be her husband and that he had the right to say, as he did, that he was her husband; and a decree was rendered by the consistory court declaring that, as appeared to the bishop, he was not the husband of the Duchess of Kingston, and he was enjoined from saying that he was. And it was insisted by her counsel on the trial before the House of Lords that this record was conclusive evidence that she was not married to Augustus John Hervey; but the House of Lords held otherwise, and she was found guilty notwithstanding the decree of the consistory court, they having found that she was the wife of Hervey when she intermarried with the Duke of Kingston. It does not very clearly appear whether the testimony was admitted, although offered, but it was before the House of Lords, and they considered it was no bar to the indictment. That case is much relied on by text-writers.

The rule is stated by some of the authorities to be, that the record sought to be introduced as a bar to the indictment, must show that the identical issue involved in the case on trial was passed upon in the former case, and when shown, the State would be bound by the judgment in the former case, because it was a party. As to this case, however, things that occurred upon the trial of the indictments in question are in the nature of *res inter alios acta*. The State is never bound in any

case by what took place on the trial of a former case, where the latter case is entirely different in all its facts and circumstances from the former. We conclude, therefore, that there was no error on the part of the court in refusing to allow these indictments to be read in evidence, or in refusing to .allow the testimony sought to be introduced, as to what was testified to on the trial of these indictments.

3. The 5th ground of the motion complains of error on the part of the court in refusing to rule out all of the testimony of the witnesses for the State showing the sanity of the defendant, upon the ground that they gave no facts upon which to base their opinions. We do not think that this exception is well-founded. The record shows that the witnesses testifying knew the defendant, and had known him for a considerable length of time, and that he always acted like a sane man ; and we think these are facts from which they could form an opinion as to his sanity or insanity.

4. The 6th ground complains that the court erred in admitting proof of the fact that the witness Jake Mathis had served a term in the penitentiary, defendant's counsel objecting thereto. This witness was sworn in behalf of the defendant, and he was asked if he had served a term in the penitentiary; the defendant's counsel objected to the question, but he answered of his own motion that he had.. He need not have made the answer ; he could have declined to answer the question, and the court would have erred if it had compelled him to do so ; but as he answered it voluntarily, it constituted no ground of objection on the part of the defendant's counsel. No witness is bound to testify to anything that will bring disgrace or infamy upon himself or his family ; but if he chooses to answer questions that are asked him, he may do so, and it constitutes no legal ground of objection on the part

of another person. The witness's character and reputation were in his own keeping and not in that of the accused.

5. We see no error in the charge complained of in 1st amended ground of the motion for a new trial; besides, in the exceptions thereto no error is pointed out. And taking the evidence into consideration, it seems quite favorable to the accused.

6. Nor do we see any error in the charges complained of in the remaining grounds of the motion. It appears to us that the charge of the court as a whole was fair and legal.

7. We think the court was right in refusing to allow the witness Peeler to testify what he (Peeler) said to the father of the defendant about the conduct of the defendant testified to by him. This was wholly immaterial.

8. And so as to the refusal of the court to allow the witness Rawlings to testify that some time prior to the killing he heard Cone, the deceased, say that the defendant was crazy. It was wholly immaterial what the deceased had said on this subject some time prior to the killing.

9. Another ground of error is that the court permitted Dr. Allen, a physician, to testify in behalf of the State as to the sanity of the defendant, his opinion not being based on .the evidence adduced on the trial, or upon a hypothetical case stated. Dr. Allen lived near the defendant for a long time, knew him well and had had frequent conversations with him, and being an expert, we think he could give his opinion as to whether the accused was sane or insane.

10. It is further alleged that the court erred in permitting H. D. D. Twiggs, of counsel for the State, to comment before the jury in his concluding argument, over objection of the defendant's counsel, upon the

statement made by Jake Mathis to L. J. Stanley and Jesse Robson, as appears from the evidence, as facts proved; the defendant's counsel insisting that what Mathis said to these parties could be used only for the purpose of impeaching his testimony, and not for the purpose of establishing the truth of his statements. This ground of the motion does not set forth what the comments of Judge Twiggs were, and before the exception could avail anything, these should have been stated. Counsel certainly had a right to comment upon all the testimony in the case; that was a matter with him as counsel; and whether he was logical or illogical, the court could not interpose. His deductions may have been very illogical, but the court could not prevent counsel from drawing illogical deductions from testimony which had been introduced.

Upon the whole case we are satisfied that the verdict of the jury is right, and that there was no violation of law on the part of the court trying the case.

*Judgment affirmed.*