## FLANDERS v. STATE.

(No. 842;   Decided March 20th, 1916;   156 Pac. 39.)
(Rehearing denied May 1st, 1916;   156 Pac. 1121.)

CRIMINAL LAW—EVIDENCE—OPINION EVIDENCE—SANITY OF ACCUSED —IMPEACHMENT OF WITNESSES—CHARACTER OF TESTIMONY REQUIRED—INSANITY—DECLARATIONS BY DECEASED—LIMITATION OF EVIDENCE RELATING TO — INSTRUCTIONS CONSIDERED TOGETHER — TRIAL—BURDEN OF PROVING INSANITY—CURE OF ERROR—HARMLESS ERROR—MORAL INSANITY—PARTIAL INSANITY AS DEFENSE— EXPERT WITNESSES—HOMICIDE.

1. In a prosecution for murder defended on the ground of insanity, where a witness denied that he had stated that deceased had requested him to telephone to defendant's brother that defendant was crazy and to come out and

have him taken care of, evidence offered that he had made such statements was inadmissible as evidence of the mental condition of defendant and not a proper foundation for impeaching the witness, but might be received as affecting his credibility.

2. In a prosecution for murder, defended on the ground of insanity, evidence that deceased had expressed the opinion that defendant was crazy, under such circumstances as to be admissible as part of the *res gestae,* but without stating the facts upon which the opinion was based, was inadmissible.

3. In a prosecution for wife murder, where a defendant was permitted to introduce evidence of declarations made by deceased, that she was worried about defendant's condition and feared he was losing his mind, it was proper for the trial court to limit evidence of such statements to those made within six months prior to the homicide.

4. An instruction that it is plain law, as well as common sense, that a man is ordinarily responsible for his voluntary acts, and that it was sought to excuse the defendant for acts which would ordinarily subject him to criminal responsibility, was not erroneous as placing the burden of proving insanity upon the defendant where another instruction was that, when evidence is offered by the defendant on the issue of insanity, the State must prove his sanity beyond a reasonable doubt.

5. An instruction that, if the jury found in the case any evidence raising a question as to defendant's sanity at the time of the killing, in considering the question of insanity, they should proceed in a certain manner, was not erroneous as commenting upon the weight of the evidence and intimating that the court doubted the sufficiency of the evidence to raise the question of the insanity, where another instruction stated that the question of insanity was raised and evidence offered in support thereof.

6. An instruction that, if defendant, in consequence of a disease of the mind, was not able to distinguish, and could not appreciate, the nature and probable consequences of his act, he was not legally responsible, and must be acquitted, and that the inquiry in such case must end right there, was not improper as telling the jury, in effect, that their labors must cease, and that they must find defendant guilty unless they discovered evidence raising the question of insanity.

7. The portion of the charge on the issue calling the jury's attention to the distinction between an act committed by reason of insanity which destroyed the will power and an act committed as the result of uncontrolled passion, not the result of disease, was properly given.

8. The instruction in which the phrase "and if he is accustomed to allow his bursts of anger" occurred, touching the distinction between an act committed from insanity resulting from disease of the mind and an act committed through ungoverned passion, not resulting from disease, was proper as not referring to defendant, but a putative sane person, and was not objectionable as unsupported by evidence.

9. A charge undertaking to distinguish moral insanity resulting from the wilful pursuance of a course of misconduct from a condition of insanity produced by disease, setting forth an example, was harmless though improper as tending to confuse the jury.

10. A charge that, if the jury upon a full and fair consideration of all the evidence had a reasonable doubt, whether defendant was insane at the time of the act complained of, and on account of such insanity could not appreciate the consequences of his act and distinguish between right and wrong, they should acquit, was not improper for the use of the word "insane" when followed by a charge that, if they believed the defendant sane and had no reasonable doubt on the subject, they should lay aside all consideration of insanity.

11. Where defendant, charged with wife murder, though insane to a certain degree, understood the nature and consequences of his act, and that it was morally wrong or forbidden by law, and also had sufficient will power to control his acts, such partial insanity did not excuse him.

12. Where experts, both for the defense and prosecution, had conversed with defendant and examined him, the charge directing the jury that in considering the opinions of any of the experts they had the right to inquire into the sources of their information, and the accuracy and truthfulness of the knowledge upon which they found their opinions. "especially where such opinions are based upon a personal examination of defendant and their conversations with him," was not erroneous as singling out defendant's experts and disparaging their testimony.

13. Where there was no dispute but that defendant shot and killed his wife, and it was not contended that he was not

guilty if he was sane at the time, instructions requested by both prosecution and defense, that all evidence introduced relating to the killing of a third person by defendant at the same time was admitted only as a circumstance attending the killing of the wife, etc., were properly refused.

14. In a prosecution for wife murder defended on the ground of insanity, the refusal to instruct that the jury should not consider for any purpose evidence touching the killing of a third person by defendant at the same time he killed his wife was harmless to defendant, where the circumstances surrounding the killing of the third person were fully gone into, and the court, at defendant's request, instructed that, if it did not substantially appear from the evidence that defendant had a motive for taking the life of his wife, the jury might consider that fact in determining defendant's sanity or insanity, since, if the jury were satisfied that defendant had no motive for killing the third person, the fact would tend to prove that defendant was insane at the time.

ON PETITION FOR REHEARING.

15. A conviction will not be reversed for conflict in the instructions, where only by selecting a sentence, or part of a sentence, and giving it a construction which it might bear if standing alone, but not when the instructions are considered as a whole, can a conflict be made apparent.

16. In a criminal case, the burden to prove defendant sane by competent evidence and beyond a reasonable doubt is on the State.

ERROR to the District Court, Sheridan County; HON. CARROLL H. PARMELEE, Judge.

Willard Flanders was convicted of murder in the first degree and he brings error. The material facts are stated in the opinion.

*T. W. Lafleiche, E. E. Enterline, Martin & Mason* and *George M. Martin,* for plaintiff in error.

The court erred in excluding evidence offered by defendant for the impeachment of the witness, Bothwell, and evidence of declarations made by deceased to said witness with reference to the mental condition of defendant, said

declarations having been made on the day of the homicide
and being a part of the *res gestae*.  (8 Wyo. 494.)  The
prosecution failed to establish a motive for the homicide and
it was shown by testimony of witnesses, as well as circum-
stances of the crime, that defendant was insane at the time
of its commission.  The court erred in excluding evidence
offered by the defense which would have shown that de-
fendant had exhibited symptoms of mental disorder for
several years prior to the homicide, and it was error to
limit the admission of testimony of this character to a
period of six months next preceding the date of the crime.
It was shown by the testimony of medical experts that de-
fendant's symptoms were of a *dementia precox,* an insidious
but gradually developing type of insanity; the declarations
of deceased made on the day of the homicide were a part
of the *res gestae.*  (State v. Nelson, 166 Mo. 191, 65 S. W.
749, 89 Am. St. Rep. 681; Diehl v. State (Ind.), 62 N. E.
51; Flower v. State (Miss.), 37 So. 814; State v. Wright
(Ia.), 84 N. W. 541; Davis v. State (Tex.), 155 S. W.
546.)  It was prejudicial error to exclude the impeaching
questions propounded to witness, Bothwell.  (Jones Evi-
dence, Sec. 843; United States v. Knowlton, 13 N. W. 573.)
The defense was entitled to show defendant's mental condi-
tion and general symptoms of mental disorder covering a
period of years prior to the homicide, in view of the fact
that it had been shown that his mental trouble was of a
progressive type.  (Guiteau case (D. C.), 10 Fed. 161;
Beaver v. Spangler, 61 N. W. 1072; Banks v. Comm., 141
S. W. 380; State v. Wright, supra.)  Instruction No. 4
given on the court's own motion was erroneous in that it
was in effect a criticism of the defendant's insanity ad-
vanced on behalf of the accused.  It covered several type-
written pages and intended to describe the testimony given
by medical experts and to confuse the jury; at paragraph
four of this instruction the jury are advised that their
labor should cease unless they discover evidence in the
case, which.raises a question as to the sanity of defendant

and that upon an issue of insanity, the burden was upon defendant. The instruction was clearly erroneous in this regard. (State v. Keryl, 75 Pac. 362; State v. Peel, 23 Mont. 358, 59 Pac. 169, 75 Am. St. Rep. 529.) The instruction attempted to define emotional insanity and discussed moral insanity and cautioned the jury, that mental unsoundness due to the impulse of greed or passion, or as a result of moral degradation was not insanity in a legal sense, and all of this in the face of the fact, that there was no evidence in the case relating to emotional insanity or moral insanity, nor facts showing an impulse of greed or passion, or of moral degradation on the part of defendant. This part of the instruction was clearly prejudicial to the defendant; where there is nothing offered by the defense with reference to the insanity of the accused, the burden rests upon the State to prove beyond a reasonable doubt that the defendant was sane when he committed the offense charged against him. (State v. Pressler, 16 Wyo. 214; State v. Crowe, 102 Pac. 579; State v. Schuff, 9 Ida. 115, 72 Pac. 664.) Instruction No. 14 contains conflicting statements of the law and for that reason presents a ground for a reversal of the case. (Clay v. State, 15 Wyo. 42, 86 Pac. 17; Palmer v. State, 9 Wyo. 40, 59 Pac. 793, 87 Am. St. Rep. 910.) Instruction No. 18 is erroneous, as it placed upon defendant the burden of proving that at the time of the homicide his mind was defective or abnormal. (People v. Holmes, 69 N. W. 501.) The court erred in modifying instruction No. 18, given upon request of defendant, as the modification destroyed the text of the instruction. Instruction No. 21 charged that, if defendant was sane on the date of the homicide, his mental condition at the time of the trial was abnormal, and was prejudicial error. Instruction No. 22 was erroneous and misleading as it tended to place the burden of proving insanity upon defendant. The modification of instruction No. 24 destroyed its true text. Instruction No. 25 was erroneous and misleading in eliminating the effect of evidence relating to declarations

and statements made by deceased prior to the homicide to the extent of malice, and thus precluding the jury from considering statements made by deceased with reference to her husband's mental condition, during many years prior to the homicide. Instruction No. 26 was erroneous in that it advised the jury that it was their duty to determine the accuracy of evidence given by medical experts as to defendant's mental condition and in commenting upon the nature of the evidence given by said experts. The court's refusal to give defendant's requested instructions No. B and No. L was prejudicial as the instructions contain a clear statement of the law applicable to the defense relied upon in this case; malice is an essential ingredient of the crime of murder in the first degree. (Comp. Stats. 5789.) Premediated malice is the willful or wrongful intention with which the act is committed and the defense of insanity goes directly to the question of malice or intention. The instructions also state the rule in this State, as to burden of proof and as to reasonable doubt. (Hotema v. United States, 186 U. S. 413; State v. McCoy (Kan.) 79 Pac. 156; Hill v. State, 60 N. W. 916.) The court's refusal to give defendant's requested instruction No. G was also erroneous for the above reasons; the court's refusal to give defendant's requested instructions Nos. C, D, E, I, M, N and O was a total disregard of any evidence introduced by the defendant tending to prove his insanity and a holding that no evidence had been introduced by defendant tending to prove insanity; the court's refusal to give defendant's requested instruction No. F was erroneous as there is a distinction between chronic insanity and types that are recurrent or intermittent. (Ford v. State, (Miss.) 19 So. 665; State v. Pressler, supra; Wharton & Stille's Med. Juri., 5th Ed. Vol 1, Sec. 304.) The word "shown" as here used is equivalent to "established." (Words & Phrases, Vol. 4, Pg. 579; State v. Crofford, (Ia.) 110 N. W. 921; People v. Davenport, 110 Pac. 318; State v. Wilmer, 40 Wis. 304.) The court erred in refusing defendant's

requested instruction No. H, limiting the effect and purpose of the evidence relating to the killing of Samuel Aultz, which refusal was highly prejudicial to defendant's rights. (12 Cyc. 631; People v. Glass, 112 Pac. 281.)

*D. A. Preston,* Attorney General, and *Burgess & Kutcher,* for defendant in error.

The testimony offered to impeach the witness Bothwell related to collateral and immaterial matters, was no part of the *res gestae,* and was properly excluded. (40 Cyc. 2699; Underhill Cr. Ev. P. 117; Wigmore Ev. P. 1023; Jackson v. State, 103 S. W. 927.) The statements communicated by deceased to Bothwell and others were merely an expression of opinion and no part of the *res gestae.* (Fisher v. State, 160 S. W. 210 (Ark.); Rhodes v. State, 153 S. W. 128 (Tex.); Gray v. State, 77 S. E. 916 (Ga.); Ogletree v. State, 42 S. E. 255 (Ga.); Wharton Crim. Ev. Sec. 262.) The excluded testimony was not connected with the homicide. It related solely to trouble which occurred that morning; to be a part of the *res gestae* it must be connected with the killing. Had deceased then declared that defendant was sane, the declaration would have been inadmissible to prove defendant's sanity. Deceased, if alive, could have expressed her opinion as to defendant's sanity after stating the facts upon which her opinion was founded. (Wharton & Stille's Med. Juri., 5th Ed. Vol. 1, Sec. 356.) But declarations of the person killed are not inadmissible to show insanity of the accused. (Wharton & Stille's Med. Juri. Vol. 1, Sec. 324; State v. Welson, 21 S. W. 443, (Mo.); State v. Pagels, 4 S. W. 931, (Mo.); People v. Schmitt, 39 Pac. 204, (Cal.); Taylor v. State, 10 S. E. 443, (Ga.); State v. Spencer, 21 N. J. L. 196.) State v. Nelson cited by defendant is inapplicable under the facts and Johnson v. State, 8 Wyo. 494 is distinguishable from the case at bar. The impeachment of a witness by calling other witnesses to prove prior contradictory statements can only be made upon material matter. (40 Cyc. 2699.) The conver-

sation between Bothwell and deceased as to defendant's insanity was not a part of Bothwell's testimony in chief, but was inquired into on cross examination and was not binding upon the State. (Wigmore Ev. 1023; 40 Cyc. 2699.) The cases of Diehl v. State and State v. Wright cited by counsel are not applicable under the facts in this case, nor are the cases of Flowers v. State and Davis v. State, nor the quotations from Jones on Evi. No testimony was elicited by the State relative to Mrs. Flanders' opinion of her husband's insanity, but if the testimony had been admitted for the purpose of impeachment, it could not be used on the question of defendant's sanity. (40 Cyc. 2764.) In the opening statement made for the defense, it was stated that it was shown that deceased had made certain declarations with reference to defendant's insanity. The statement was objected to and the court ruled that such declarations made within six months prior to the homicide would be admitted. The rule was erroneous but only the State had a right to complain as none of the declarations were admissible for the purpose of proving insanity. Instruction No. 14 is attacked on several grounds, none of which appear to be meritorious. Among other things it is objected that it comments upon the evidence as counsel for defendant in preceding instruction No. 13 supplied a reason why this language was not erroneous. Objection is made to the use of the word "insane" instead of the word "sane", being opposite terms and it is immaterial whether one word, or the other is used. (Brotherton v. People, 75 N. Y. 159.) There is a division of authority on the question of whether irresistible impulse of itself is a legal defense to homicide. (Wharton & Stilles Med. Jur. (5th Ed.), Sec. 192.) It is proper to illustrate a proposition of law by assuming facts of illustration that are not in the evidence. (11 Pl. & Pr. 206.) None of the delinquencies mentioned in the illustrations used were imputed to defendant. There are two well recognized definitions of insanity; one by the medical profession embracing all forms and degrees of mental dis-

order; the other recognized by law embracing only such degrees of mental weakness as constitute an excuse for crime. State v. Crowe is cited to support the objection to instruction No. 14, but there is a wide difference between that case and the case at bar. As against the Crowe case, we call attention to Brotherton v. People, supra; Walker v. People, 26 Hun, 67; State v. Stickley, 41 Ia. 232; O'Connell v. People, 87 N. Y. 377, 41 Am. Rep. 379. The New York rule as to the burden of proof on questions of insanity was followed in State v. Pressler, 16 Wyo. 221. Taken as a whole instruction No. 14 is correct. A similiar charge was approved in Harnish v. People, 142 Ill. 620, 18 L. R. A. 237, 32 N. E. 677. The facts show that defendant was either wholly insane, or guilty of premeditated murder, hence the last paragraph of instruction No. 18 is not erroneous. (Wharton & Stille's Med. Juri. Sec. 188; 16 Ency. of Law 621 (2nd Ed.); 31 Cyc. 1066.) If defendant was sane at the time he committed the crime, he would be liable even though insane at the time of the trial. Hence instruction No. 21 was properly given. The modification of instruction No. 24 was not error, as insane persons frequently act from motive; the motive may be rational, but the will regulating the action may be uncontrollable. Motive should not be confused with intent. (People v. Molineux, 168 N. Y. 264, 61 N. E. 286; 12 Cyc. 149; Wharton & Stille's Med. Jur. (5th Ed.), Sec. 217.) The objection to instruction No. 25 is without merit, if erroneous it was in favor of defendant and against the State. The objections to instruction No. 26 appear to be imaginary. Clearly, the jury has a right to inquire into the source and reliability of the facts upon which all experts base their opinions. It was impossible to prove the killing of deceased without showing the killing of Aultz, which was a part of the *res gestae* and defendant's requested instruction "H" was properly refused. (People v. Glass, 112 Pac. 21.) Counsel for defendant have shown commendable diligence, but have failed to point out prejudicial error committed by the court below. The facts relating to the

homicide are undisputed and the cause was fairly submitted on proper instructions. The evidence of defendant's insanity, even if believed, tends to prove nothing more than insanity at a time five months after the homicide which the defense endeavors to extend back over a period of time to cover the deed in question. The verdict and judgment should be affirmed.

BEARD, JUSTICE.

The plaintiff in error, who was defendant below, and will be referred to as defendant, was convicted in the district court of the crime of murder in the first degree and sentenced to suffer death. He brings the case here on error.

The defense was insanity; and it is not contended that the evidence was insufficient to support the verdict and judgment if the defendant was sane at the time he committed the homicide. Therefore only so much of the evidence as is necessary to present the questions raised by the assignment of errors will be referred to. It appears that on the morning of July 17, 1914, the defendant had some trouble with his wife, Alice Flanders, over her refusal to sign a deed or some papers to a house in Chadron, Nebraska, and that he had struck and choked her. At that time or very soon thereafter a neighbor, Sam Aultz, came to their home on an errand and stated that he was going to the town of Hulett that afternoon, and Mrs. Flanders asked if she could go with him, to which he assented and they left the Flanders' home together. That was shortly after ten o'clock a. m. After they had gone defendant went to the post office at Alva, passing the home of John C. Bothwell with whom he had a conversation both on his way there and when returning, between which times Aultz and Mrs. Flanders were at Bothwell's for a short time. After defendant's return home and probably between noon and one o'clock p. m. he directed his son, a boy about seventeen years of age, to go to Aultz's and if his mother (Mrs. Flanders) wanted to go to Hulett to hitch the team to the buggy and take her. After the boy left the house defendant took

his gun and went to a place where he could see Aultz's house, saw the boy go to Aultz's and return, get the rig, go back to Aultz's, saw Mrs. Flanders get in the buggy with him and start down the road. At the same time he saw Mr. and Mrs. Aultz get in their buggy and follow closely behind the others. This was probably between three and four o'clock p. m. Defendant then went to a point on the road where they would pass, sat down by the side of the road near some bushes, and as they came by he shot Aultz twice, killing him, and a few minutes thereafter shot and killed Mrs. Flanders, for whose murder he was convicted, and from which judgment this proceeding in error is brought.

Bothwell was called and examined as a witness on behalf of the State, and, after testifying to the conversation with defendant that forenoon, after the trouble and before Aultz and Mrs. Flanders came to his house, he was asked: "Q. You may state whether or not after you had this conversation you saw Mrs. Flanders that morning?" A. "I did." Q. "Without stating any conversation with her, you may state what was her appearance, what you saw and where you saw her?" Witness stated he saw her at his home, and described her appearance. He was then asked to fix the time, and in his answer repeated something Mrs. Flanders said, when counsel for the State said: "Never mind what she said. I don't care what she said. Strike that out." Again when witness repeated something Aultz said, counsel again said: "Never mind what Aultz said." Witness again stated something that was said, when counsel for the State said: "They say they haven't any objection, so go ahead and state what she said." Witness proceeded to give the conversation, and while doing so, counsel for defendant interposed the following objection: "Defendant objects to the witness giving his opinion of her thoughts; he can give her conversation." We have set out so much of what appears in the record to show that this conversation was not sought to be brought out by the prosecution, but was admitted not only without objection on the part of de-

fendant, but with his consent and apparently at least upon his counsel's suggestion. Witness stated that Mrs. Flanders said to him: "I want you to telephone for your mother and Randall Flanders right away." (Randall Flanders was defendant's brother and witness's stepmother was Mrs. Flanders' sister.)   On cross-examination he was asked if Mrs. Flanders did not say to him to telephone to Randall Flanders "that his brother was crazy and to come out and have him taken care of." Over objection of counsel for the State the witness was permitted to answer, and denied that she had made such statement, but said to telephone Randall to come at once.   He also denied having stated to parties named at a certain time and place that she had requested him to telephone that defendant was crazy. At the proper time defendant offered to prove that he had so stated.   On objection that evidence was excluded; and that ruling is assigned as error.   It is contended that if defendant had been permitted to prove that Bothwell had stated out of court that Mrs. Flanders requested him to telephone defendant's brother that defendant was crazy, her opinion as to defendant's mental condition should and would have had great weight with the jury.   But had it been proven that Bothwell had formerly stated that Mrs. Flanders made such request or had expressed the opinion that defendant was "crazy"— a word of doubtful and indefinite meaning—it would not have established the fact that she had made such statement or expressed such opinion. The only purpose for which the offered evidence was admissible, if admissible at all, was to effect the credibility of the witness, Bothwell.   It was entirely incompetent and immaterial as evidence of the mental condition of defendant.   Had it been proven that she had expressed the opinion that defendant was crazy and under such circumstances as to be admissible as part of the *res gestae,* as claimed by counsel, it was still incompetent for the reason that she did not state the facts upon which the opinion was based. What we deem to be the correct rule as to the admissibility of such opinions is stated in 1 Wharton

& Stille's Medical Jurisprudence, (5th Ed.) Sec. 352, as follows: "The unsupported opinions of witnesses other than experts and subscribing witnesses to an instrument, as to the capacity of a person, considered merely as opinions, are not admissible in evidence. A witness who is not an expert cannot testify as to his opinion with reference to the mental capacity of another, without stating the facts or reasons upon which his opinion is based. Opinions must be founded on facts, which must be given to the jury, that they may determine the weight to be given to the opinions." See also, 1 Wharton's Criminal Evidence (10th Ed.) 753; Ragland v. State, 125 Ala. 12, 27 South. 983; Armstrong v. State, 30 Fla. 170, 17 L. R. A. 484, 11 So. 618; Bothwell v. State, 71 Neb. 747, 99 N. W. 669; Lawson v. State, 171 Ind. 431, 84 N. E. 974; Jamison v. The People, 145 Ill. 357, 34 N. E. 486; People v. Schmitt, 106 Cal. 48, 39 Pac. 204; Lamb v. Lippincot, 115 Mich. 611, 73 N. W. 887; Hull v. Hull, 117 Ia. 745, 89 N. W. 979; State v. Hayden, 131 Ia. 1, 107 N. W. 92, 97; State v. Stickley, 41 Ia. 232. What Mrs. Flanders may have said about defendant being crazy being inadmissible, it could not be made the foundation for impeaching Bothwell, and there was no error in the court's refusal to permit defendant to do so.

Defendant was permitted, over the objection of plaintiff, to introduce evidence of conversations between Mrs. Flanders and other parties in which she stated that she was worried about defendant's condition and that she feared he was losing his mind. It is urged that the court erred in limiting evidence of such statements to statements made within six months prior to the homicide. We think the court was very liberal toward defendant in admitting what Mrs. Flanders had said, and that he was not prejudiced by the limit fixed by the court. (Taylor v. State, 83 Ga. 647, 10 S. E. 442; State v. Spencer, 21 N. J. L. 196; and authorities above cited.)

Numerous exceptions were taken to the instructions given, and to those requested and refused, and particularly to the giving of instruction No. 14, which is as follows:

"It is plain law, as well as common sense, that a man is ordinarily responsible for his voluntary acts. In this case it is sought to excuse this defendant for acts which would ordinarily subject him to certain criminal responsibility, on the ground that at the time of performing such acts he was insane.

"It becomes, then, a matter of the highest importance to inquire what is insanity in the sense the term is here used, and at what times and under what circumstances such insanity will excuse the defendant from the consequences of his acts.

"There are various forms of insanity which are recognized by medical men and those who have given particular study to the manifestations of the human mind. Particular terms are applied to it as it manifests itself in different forms, and as the persons so afflicted exhibit different symptoms, delusions, dispositions and tendencies. It is unnecessary for us to explain or to consider all these different forms of insanity and their peculiar characteristics. Perhaps no exact scientific definition of insanity has ever been given, or is possible; but it will be quite possible to explain what insanity is in a way which shall be entirely sufficient for our purpose. Insanity may be said to be a defect, an unsoundness or injury of the mind, induced by disease, whereby its functions or duties, or some of them, are disordered or deranged and are no longer perfectly performed.

"If you find in this case any evidence which raises in your minds a question as to the sanity of the defendant at the time the fatal shots were fired, then in considering the question of his sanity or insanity, and his consequent responsibility or irresponsibility for the act committed, you should proceed in the manner indicated as follows and inquire:—

"1.   Was the defendant at the time of the shooting as a matter of fact insane?

"2.   If such be the case, was he at the time able to distinguish between right and wrong as applied to the particular act in question? And did he understand and appreciate the nature and probable consequences of his act?

"If in consequence of such disease he was not able so to distinguish, and could not appreciate the nature and probable consequences of his act, he is not legally responsible and must be acquitted. The inquiry in such case must end right here.

"3. And although he may have had at the time of the act a knowledge of right and wrong and the power to distinguish between them, he may nevertheless be not legally responsible; but to excuse him under such circumstances from responsibility, two other conditions must exist at the same time.

"(a) If his insanity was the cause of his act, (as through an insane delusion), but for which it would never have been committed; and

"(b) If also at the same time, by reason of the progress of the mental disease upon his will, he was powerless to choose the right which he knew and approved, and to abstain from the wrong, though he may have recognized it as such,—then and in that case also the defendant can not be held legally accountable, and must be acquitted.

"But right here a word of caution is necessary. When we are talking of inability of an insane person to choose the right and to avoid the wrong, something different is meant from mere frenzy or ungovernable passion, however furious, growing out of hatred, anger, jealousy, revenge, or the like. There is no injustice in holding a sane man accountable for the fury of his angry passions; and if he is accustomed to allow his bursts of anger to manifest themselves in violence until from continued lack of control he becomes unable, (or thinks he is), to restrain himself, he is not less blameworthy, but rather more so. The lack of will power to control one's passions which will excuse him from the consequences of crime is not mere ungovernable rage displacing the reason, but is the distinct result of a mental disease destroying and overpowering the will. Much of the so-called emotional insanity is not insanity at all, but mere fury of a passionate soul which has been habitually allowed to go without control.

"And here too we should distinguish moral insanity—so-called—which is not insanity at all—at least not in the legal sense. It is well known that there are many depraved persons, who, by continued indulgence in vice and crime, have so debased and debauched their moral sense and blunted their susceptibilities that the 'still small voice' of conscience no longer responds to the dictates of human or divine law, and.fails to utter warning against the impulse of greed or passion. Sometimes the degradation is so complete that the most vile and detestable acts fail to bring the faintest shame or remorse to the perpetrator. This may be moral insanity, so-called, but, such depravity being induced by the voluntary maintenance of a conscious course of vicious indulgence on the part of the person concerned, and not by disease, there is manifest reason why such person should not be excused on the ground that his conscience fails longer to give a correct report of right and wrong. Moreover, though the man's conscience may break down in its proper function, such person cannot fail, if sane, to know how society and the laws of the state regard the act. For example, the most confirmed thief will hardly be heard to say that his conscience did not reprove him for the theft, so long as the defect in conscience is not the result of disease, but of his own willful pursuance of a course of dishonest conduct. Thus it is important to notice that the insanity which will excuse in law, is the product of disease and not of the defendant's own misconduct.

"If, therefore, the testimony convinces you of the defendant's irresponsibility as measured by the above test, or if you, upon a full and fair consideration of all the evidence, have a reasonable doubt whether the defendant was insane at the time of the act complained of, and on account of such insanity could not at the time appreciate the nature and probable consequences of his act and could not distinguish between right and wrong with reference to his act, you should acquit him. And furthermore, if there remains with you a reasonable doubt whether the defendant, being insane

but knowing right from wrong, would not but for such insanity have committed the act complained of, and was at the time on account of such infirmity powerless to refrain from doing the act—if, I say, you have such reasonable doubt, you should acquit him.

"If you believe the defendant sane, and have no reasonable doubt on this subject, you should lay aside all consideration of insanity.

"And although you may believe that the defendant is in some manner a victim of mental disease, or is insane, as it is said, nevertheless if the evidence convinces you beyond a reasonable doubt that, at the time of the shooting, he knew and understood the nature and probable consequences of his act and knew that it was morally wrong or forbidden by law, and furthermore that, at the same time, he had sufficient power of will to enable him to control his acts and to repress the impulse to kill his victim, then I charge you his insanity will not constitute any legal excuse for his act, and you should treat the case as though no evidence of insanity had been introduced."

It is insisted that the first paragraph of that instruction placed the burden of proving insanity upon the defendant. We do not think it fairly susceptible of that construction; especially when read and considered in connection with other instructions given. Instruction No. 12 is as follows: "You are instructed that the defendant is presumed to be sane and it is not incumbent upon the state to introduce evidence in the first instance to prove he was sane. But when evidence is offered by the defendant on that issue, the state must prove his sanity beyond a reasonable doubt at the time of the shooting." Instruction No. 13 is as follows:

"I charge you that in this case the sanity of the defendant at the time of the alleged homicide has been questioned and raised by the evidence in the case, because the defendant has interposed the plea of insanity, and evidence has been offered in support thereof, and I charge you that the burden of proof that the defendant was sane at the time of the

homicide now rests upon the state, and it must satisfy you beyond a reasonable doubt that at the time of the shooting the defendant was sane, that the doing of the acts which constitute the crime charged in the information proceeded from a responsible agent, one capable of committing the offense. The burden is upon the state to prove every essential element of this crime to your satisfaction and beyond a reasonable doubt, and the elements that necessarily enter into and constitute the crime of murder in the first degree are purpose, premeditated malice and the sanity of the accused at the time of the homicide, and the state must satisfy you beyond a reasonable doubt that all of these elements existed at the time of the homicide before you can convict the defendant of the crime charged in the information, and if the state has failed to so satisfy you of the existence of any one of these elements, you must resolve that doubt in defendant's favor and acquit him." Similar directions as to the burden and degree of proof of insanity are also found in other instructions given.

The correctness of the fourth paragraph of the fourteenth instruction is challenged, and it is insisted that the language "If you find in this case any evidence which raises in your minds a question as to the sanity of the defendant," was a comment upon the weight of the evidence and an intimation that the court doubted the sufficiency of the evidence to raise that question. Here again this statement must be considered with what was stated in the thirteenth instruction in which the jury was told that the question was raised and evidence offered in support thereof. Having been so instructed, we think the jury must have understood it to be its duty to consider such evidence and if any of it was deemed sufficient to indicate insanity, then the jury should proceed to determine, in the manner stated by the court, whether or not the insanity was of such nature or degree as to raise in the mind of the jury a reasonable doubt as to the legal responsibility of defendant for the act committed. Counsel says in his brief that paragraph four of instruc-

tion fourteen "is further objectionable because it tells the jury in effect that their labors must cease, and that they must find the defendant guilty, unless they discover evidence in the case which raises in their minds a question as to the sanity of the defendant." In this counsel is in error. The language of the instruction is, "If in consequence of such disease he was not able so to distinguish, and could not appreciate the nature and probable consequences of his act, he is not legally responsible and must be acquitted. The inquiry in such case must end right there."

That portion of the instruction marked 3. (a), (b), is complained of. We fail to see wherein it was prejudicial. By that portion of the instruction the jury was told that although defendant had a knowledge of right and wrong and the power to distinguish between them, yet if the act was caused by insanity, but for which it would not have been committed, and if by reason of the progress of the disease he was powerless to choose the right and abstain from the wrong, then in that case he could not be held legally accountable, and must be acquitted. By what the court said a juror would certainly understand that although defendant possessed the mental capacity to distinguish between the right and the wrong of his act; yet, in order to warrant his conviction it must be further proven that he had the power to choose the right and abstain from the wrong. Objection is made to that part of the instruction commencing with the words, "But right here a word of caution is necessary." The court very properly, we think, called the attention of the jury to the distinction between an act committed by reason of insanity which destroyed the will power, and an act committed as the result of uncontrolled passion not the result of disease. It is further urged that the language, "and if he is accustomed to allow his bursts of anger", etc., was prejudicial because there was no evidence that defendant did so. The court was here speaking of a sane man, and not of defendant, as clearly appears by the first clause of the sentence. The next paragraph of instruction four-

teen in which the court speaks of moral insanity, and gives
an example, is sharply criticized. The court was evidently
endeavoring to aid the jury in arriving at a just verdict by
pointing out the difference between the kind and degree of
insanity which the law recognizes as a defense in a criminal
action, and other conditions of the mind which do not ex-
cuse. While we are not convinced that prejudice did or
could result to the defendant from this instruction, we are
of the opinion that it might well have been omitted. A still
more elaborate instruction in the same line was given in
State v. Spencer, 21 N. J. Law, 196, in which, after defining
the insanity which would constitute a defense, the judge
said: "And here I am not sure but I might safely leave this
branch of the subject in your hands without further com-
ment, for I fear that further remarks might tend rather to
confuse, than to assist you." And in State v. Keerl, 29
Mont. 508, 75 Pac. 362, 101 Am. St. Rep. 579, it is said:
"It is worthy of remark that juries must be composed of
men of a very high order of intelligence if they are much
enlightened—indeed if they are not badly confused—by the
mass of instructions usually given to them by courts in in-
sanity cases." We are of the opinion that when the degree
of mentality of the defendant which the state must prove in
order to convict is once clearly stated it is sufficient; and that
an extended and elaborate analysis of insanity in general, or
of the different kinds and degrees, is more likely to confuse
than to aid the jury in arriving at a correct verdict.

It is earnestly urged that the court erred in giving the
paragraph of the fourteenth instruction which commences
with the words, "If, therefore, the testimony convinces you
of the defendant's irresponsibility", etc. It is contended that
this paragraph cast upon defendant the burden of proving
insanity by telling the jury "if you, upon a full and fair con-
sideration of all of the evidence, have a reasonable doubt
whether the defendant was insane at the time of the act
complained of", etc. It is the use of the word *insane* which
is complained of. If that part of the sentence stood alone

the argument would have weight. But when considered with what follows in the next paragraph, viz: "If you believe the defendant sane, and have no reasonable doubt on this subject, you should lay aside all consideration of insanity"; and also when considered with other instructions on the burden of proof, we discover no reason for believing that the jury was at all likely to be, or was misled. (Walker v. People, 26 Hun (33 N. Y. Sup.) 67; Brotherton v. The People, 75 N. Y. 159; O'Connell v. People, 87 N. Y. 377, 41 Am. Rep. 379.) The last paragraph of instruction fourteen is also objected to. We fail to discover wherein it is erroneous. By it the jury was told in effect that insanity to a certain degree was not such insanity as would excuse the defendant. If the jury was satisfied beyond a reasonable doubt that notwithstanding such mental condition he knew and understood the nature and consequences of his act and knew that it was morally wrong or forbidden by law; and furthermore that he had sufficient will power to control his acts, then such partial insanity would not constitute a legal excuse for his act. That, in substance, we believe to be the rule of law in such cases.

Much space in the brief of counsel for defendant is devoted to instruction twenty-six, in which the court directed the jury that in considering the opinions of any of the experts who had testified in the case, the jury had a right to inquire into the source of their information, and the accuracy and truthfulness of the knowledge upon which they found their opinions, "especially where such opinions are based upon a personal examination of defendant and their conversations with him." And if the jury believed from the evidence that the information upon which any expert based his opinion was unreliable or untrustworthy, the jury would have a right to give such opinion such weight as they believed it entitled to in view of all the evidence in the case. It is urged that the phrase above quoted singled out defendant's experts and disparaged their testimony, because they had made a personal examination of defendant and had con-

versed with him a short time before the trial and about five
months after the homicide. But it also appears from the
evidence that at least two of the experts who testified for
the State had conversed with defendant, one the evening
after the shooting and again about six weeks thereafter; and
the other about two months after the shooting had made an
examination of defendant's mental condition and conversed
with him. So that it appears that the expression used in the
instruction applied to the experts upon each side. There was
a direct conflict in the opinions of the experts as to the
mental condition of defendant; and a jury would naturally
and without any instruction on the subject inquire into the
reliability of the information upon which the several opinions
were based, and give to such opinions such weight as they
were entitled to in view of all facts disclosed by the evi-
dence; and the instruction does not direct them to do
otherwise.

The giving of a number of other instructions is as-
signed as error, each and all of which we have carefully
considered, but find nothing therein which in our opinion
was prejudicial to defendant. The instructions were quite
voluminous—thirty-four in number—and in such case it is
not difficult to select a sentence or part of a sentence from
the body of the instructions which if standing alone would
be erroneous and prejudicial; but when considered in con-
nection with other plain directions on the particular matter
could not be misunderstood by the jury.

The defendant requested the court to give fifteen instruc-
tions, one of which the court gave as requested, two were
properly modified and given; and of the others we find all
but one sufficiently covered by the instructions given. The
instruction last mentioned was to the effect that the testi-
mony relating to the shooting of Aultz was not admitted
for any of the purposes of this case, but was received be-
cause it was impossible to separate it from the circum-
stances surrounding the shooting of Alice Flanders. And
that the jury had no right to consider any of the testimony

that had been admitted relating to the shooting of Aultz, because it had no bearing whatever on the merits of this case, and that the jury should not take into consideration in any way any of such testimony. On this same subject we find in the record that the State also requested the court to instruct that all evidence introduced relating to the killing of Aultz was admitted for the sole and only purpose of explaining to the jury the circumstances attending the killing of Alice Flanders, and such evidence was competent and admissible only so far as it explained the occasion or the cause of the killing of Alice Flanders and the intent and motive with which it was done. Both requests were properly refused. That defendant shot and killed Alice Flanders was not in dispute, nor was it contended on the trial that he was not guilty if he was sane at the time. It is contended by the defendant's counsel that no motive for the killing of Alice Flanders was sufficiently shown; and at the request of defendant the court instructed the jury that if it did not satisfactorily appear from the evidence that defendant had a motive for taking the life of deceased, the jury might consider that fact in determining the sanity or insanity of the accused. The circumstances surrounding the killing of Aultz were quite fully gone into without objection, and if the jury was satisfied that defendant had no motive for killing him, that fact would tend to prove that defendant at the time was insane; and the refusal to instruct that the jury should not consider that evidence for any purpose was favorable to defendant.

From a consideration of the entire record we are convinced that defendant had a fair trial and that the verdict is amply sustained by the evidence.

The judgment of the district court is affirmed, and Friday, the 16th day of June, 1916, is fixed for the execution of the judgment of that court.        *Affirmed.*

POTTER, C. J., concurs.

SCOTT, J., being ill, did not participate in the opinion.

ON PETITION FOR REHEARING.

PER CURIAM.

Counsel for plaintiff in error have filed a petition for a rehearing in this case, and in their brief in support thereof have again urged that certain instructions given to the jury were erroneous and prejudicial to the defendant below, and that we were in error in not so holding. The case, on the former hearing, was very fully and ably presented to this court both in an elaborate brief and in oral argument covering all of the questions upon which a rehearing is asked We gave to the case that careful and full consideration its gravity demanded, both individually and in our consultations, and arrived at the conclusion stated in the opinion handed down. We have again given careful consideration to the arguments of counsel contained in their very earnest and respectful application for further hearing; but we are still of the opinion that the defendant had a fair and impartial trial, and that he was not prejudiced by the instructions complained of. We think the case is distinguishable from Palmer v. State, 9 Wyo. 40, 59 Pac. 793, 87 Am. St. Rep. 910. In that case there was a clear and direct conflict in the instructions. In this case it is only by selecting a sentence or part of a sentence in the instructions and giving to it a construction which it might bear if standing alone, but which could not be reasonably given to it when the instructions are considered as a whole, that any conflict is made apparent. We have endeavored to the best of our ability to place that construction upon the instructions which we believe an impartial jury of reasonable men would give to them, and as we believe they would be understood and were in fact understood by the jury in this case. The trial court so clearly and so frequently in its instructions told the jury in unmistakable language that the burden of proving the sanity of the defendant by competent evidence and beyond a reasonable doubt rested upon the state, that we are convinced that the jury could not have been and was not misled by the other statements in the instructions

which are complained of. Upon consideration of the petition for rehearing and the brief in its support we are convinced that our conclusions as announced in the former opinion would not be changed by a reargument of the case, and that a rehearing should be denied. It is so ordered.

*Rehearing denied.*