Ross Calvin REILLY, Appellant
(Defendant below),

v.

The STATE of Wyoming, Appellee
(Plaintiff below).

No. 4029.

Supreme Court of Wyoming.

May 9, 1972.

Rehearing Denied June 28, 1972.

See 498 P.2d 1236.

William K. Archibald, of Holstedt & Archibald, Bruce P. Badley, Sheridan, for appellant.

Clarence A. Brimmer, Atty. Gen., Wm. L. Kallal, Asst. Atty. Gen., Cheyenne, James N. Wolfe, County Atty., Sheridan, for appellee.

Before McINTYRE, C. J., and PARKER, McEWAN, and GUTHRIE, JJ.

Mr. Justice GUTHRIE delivered the opinion of the court.

This is an appeal from a judgment based upon a conviction of second degree murder with the finding that the defendant was sane at the time of the commission of the crime of killing his mother.

The file reflects that a complaint was filed on February 3, 1969, alleging that Ross Calvin Reilly, defendant, appellant herein, murdered his mother, Bessie Reilly, on January 31, 1969. On March 7, 1969, a

preliminary hearing was had and appellant was bound over to the district court. On March 11, 1969, he was arraigned and entered a plea of not guilty, not guilty by reason of insanity at the time of the alleged offense, and not triable by reason of present insanity. An order was entered committing defendant to the Wyoming State Hospital for an examination under the statute, § 7–241, W.S.1957, 1971 Cum. Supp. Dr. Karn, Superintendent and Medical Director of the State Hospital, by letter of April 28, 1969, made a report which recited certain examination procedures and quoted Dr. Katz, who at the time of the examination was the Associate Superintendent of the State Hospital, in substance as finding that defendant was a schizophrenic, paranoid type, and was "seen as *not* being responsible for his conduct because of his present mental illness and he is to be considered dangerous." He further requested that the court consider the plea of not triable by reason of present insanity and order that he be committed to the Wyoming State Hospital until such time as he could stand trial. The file shows that Dr. Morrison, a Sheridan psychiatrist, had also examined defendant at the State Hospital on April 24, 1969.

Pursuant to stipulation of his counsel and the then prosecuting attorney, hearing was had before District Judge C. Stuart Brown in Uinta County on May 28, 1969. As a result of said hearing defendant was ordered into the custody of the State Board of Charities and Reform for hospitalization and treatment at the State Hospital based on the findings of mental illness and lack of mental capacity to assist in the preparation of a defense.

On February 4, 1971, Dr. Pace, Associate Superintendent of the State Hospital, advised the trial judge that the earlier report of April 28, 1969, did not give an opinion as to Reilly's mental condition and lack of responsibility at the time of the alleged offense. The opinion of Dr. Katz appearing in the first letter is repeated but it apparently was the intention of the last letter to set out that this was not an official finding. Reference is made in this letter to a finding of Dr. Morrison that in his opinion Reilly was psychotic on April 24, 1969, and also at the time of the commission of the crime.

On January 29, 1971, Dr. Pace certified to the court pursuant to statute that defendant was able to stand trial. This letter further stated it was essential he continue to take Thorazine regularly until the trial was over and gave dosage at 400 milligrams daily.

There appears further in the file a release of defendant for a two-year convalescent leave, although his commitment was not terminated.

The foregoing was the condition of the file when defendant was returned to Sheridan for purposes of trial.

Defendant on this appeal contends that the State failed to sustain its burden of proof beyond a reasonable doubt as to the sanity of the defendant at the time of the commission of the offense; and in addition thereto that the court erred in receiving evidence of statements by defendant to police officers at Billings, this upon two grounds, (1) that defendant was not properly advised of his constitutional rights, and (2) that because of his mental incapacity he could not have voluntarily and knowingly waived his constitutional rights; that the court erred in certain evidentiary rulings; and that the court erred in the failure to give certain instructions.

Defendant produced his brother, John, as a witness who testified as to defendant's behavior after his discharge from the Air Force; as to defendant's suspicions that people were trying to kill him and there was a plot against him in the Air Force; as to his belief that people were reading his mind and that he was being hypnotized; that he thought both his brother and mother were trying to hypnotize him; that he had advised defendant to see a minister and to see Dr. Morrison; that defendant believed there was a plot against him; that he thought his mother was a part of that plot; that people were using his mind; that he

was nervous; that he wore soiled clothing; and that he had a frightening look.

Jerry Kuchera, a friend, also testified to a substantial change in the character of defendant after his discharge from the Air Force and as to his personal appearance, behavior, and thought habits. He classified defendant as paranoid and suspicious where he had formerly been gay and fun loving. Defendant also discussed the delusion with the witness that some organization which was vast and worldwide was after him and was picking his mind.

Dr. Robertson, Chief Psychiatrist at the Veterans Administration Hospital at Sheridan, an institution for the treatment of the mentally disturbed, testified that he had seen defendant two or three weeks before the incident when defendant visited his office. After a short visit he suggested treatment; he thought defendant was psychotic, schizophrenic, and probably paranoid. He advised Mr. Byers, the V.A. Contact Officer, of this condition. Byers talked to defendant shortly, who denied he was a veteran, and after he saw defendant for this short time called Dr. Morrison and the county attorney and advised them there was a man (referring to defendant) wandering around the halls of the hospital and suggested that if it would be possible to get defendant in a treatment situation it would be very helpful. Nothing further was done in this regard apparently except two visits defendant made to Dr. Morrison prior to this tragic event.

Dr. Katz, who as noted above was Associate Superintendent of the State Hospital at the time defendant was sent there for examination, and has made the most complete examination of this defendant, testified unequivocally as to defendant's insanity at the time of the commission of the offense and that he could not have controlled his actions had he known they were wrong. He directly testifies that in his opinion defendant did not know the natural and probable consequences of his act and did not know the difference between right and wrong but had he known he could

not have stopped himself from committing the murder; that defendant was gravely ill; that his judgment was completely impaired; that he was schizophrenic, paranoid type, which had been developing for some time; that this act was a product of a diseased mind; that he did not think defendant would come to trial; and that he had seen him daily from March 20, 1969, until December 31, 1969, when Dr. Katz left the hospital.

Dr. Morrison testified defendant was suffering from long-standing schizophrenia, paranoid reaction, which had existed for several years prior to the incident. He refused to express any opinion as to whether defendant might or might not have known what he did was morally wrong but did express an opinion that there was some evidence he might have understood the natural and probable consequences of his act, although he refused to express any opinion thereon; that he had some understanding that what he was doing was illegal but that he had delusions which made him feel justified in what he did. He had no opinion as to whether defendant's condition was such that it would destroy or overpower his will. In response to an inquiry as to whether defendant could distinguish between right and wrong in connection with the particular act he stated that "his ability to think clearly about what he was doing at that time was definitely impaired," that such impairment was due to the diseased condition of his mind, and that the defendant's understanding of this act was relatively impaired by the delusions. Dr. Morrison had seen defendant twice in January 1969 prior to this event as well as examining him on April 24. He testifies defendant was obviously psychotic upon the occasion of these two visits; that when he saw him in April, because of medication, he was much improved over his earlier condition; and that his mental illness was much greater in January than on April 24.

The deposition of Dr. Morrison was taken by the State but was introduced by defendant at the trial. The only evidence

upon which the State relies, aside from the deposition of Dr. Morrison, is the testimony of Officers Smith, Lund, and Sampson of the Billings Police Department, who testified as to a verbal confession and about the appearance, behavior, coherence, and responsiveness of defendant on February 3, 1969, when he came to the Billings Police Station and told the officers of the shooting of his mother. They testified he was cool, calm, polite, and cooperative; that his conversation was normal—nothing out of the ordinary—and he asked and answered questions in logical sequence; that his appearance was unusual in the way he was dressed, including wearing sunglasses inside at night; and that he was dirty, including his clothes. They originally thought him a crank or that he might have escaped or walked away from the V.A. Hospital at Sheridan.

There was no other lay testimony offered by the State as to his behavior or conduct after his arrest and while confined at Sheridan, or by any others who might have known him before the incident. Nor was Dr. Pace, Associate Superintendent of the Wyoming State Hospital who certified defendant for trial, or any other witnesses from that institution proffered, although it is clear their opportunities for examination, observation, and evaluation were far better than those of Dr. Morrison or Dr. Robertson. Although Dr. Karn was present in the earlier stages of the trial, he appeared only as a custodian of records. The doctor did not have sufficient knowledge about defendant to testify.

■ The rule has been clearly established in Wyoming by both statute and case law that the burden of proving sanity beyond a reasonable doubt rests upon the State, § 7–242, W.S.1957; Flanders v. State, 24 Wyo. 81, 156 P. 39, 42–43, rehearing denied 156 P. 1121; State v. Pressler, 16 Wyo. 214, 92 P. 806, 809–810, 15 Ann.Cas.

93. By the statute the legislature has additionally limited the presumption of sanity *until* evidence to the contrary is introduced.

■ Neither this court nor any trial court should ever substitute its opinion for that of the jury and a jury's finding of fact or a judge's refusal to grant a new trial should not be interfered with if there is any substantial evidence to support it, Murdock v. State, Wyo., 351 P.2d 674, 678; State v. Callaway, 72 Wyo. 509; 267 P.2d 970, 978. However, this court has at least twice in the past, after critical examination of the evidence, reversed cases based upon a finding that there was no "substantial credible evidence" to support the verdict, State v. Vines, 49 Wyo. 212, 54 P.2d 826, 834–836; Jones v. State, 26 Wyo. 293, 183 P. 745, 747. The Supreme Court of the United States has not hesitated to examine a record to determine if there was competent and substantial evidence to support the verdict, Mortensen v. United States, 322 U.S. 369, 64 S.Ct. 1037, 1040, 88 L.Ed. 1331. In a case involving a defense of insanity, the Supreme Court has further said, Lynch v. Overholser, 369 U.S. 705, 713, 82 S.Ct. 1063, 1069, 8 L.Ed.2d 211:[1]

"* * * Consequently, the trial judge or jury must reach a judgment or verdict of not guilty by reason of insanity even if the evidence as to mental responsibility at the time the offense was committed raises no more than a reasonable doubt of sanity. * * *"

To refuse to examine the record in a case of this character to determine the existence of substantial evidence would be simpler but would in effect repeal the statutory requirement of proof beyond a reasonable doubt.

From the preceding it is apparent that instead of a real conflict between the experts in this case, Dr. Morrison's testimony is really corroborative of the testi-

---

1. This citation is based upon the holding of Davis v. United States, 160 U.S. 469, 16 S.Ct. 353, 358, 40 L.Ed. 499; 165 U.S. 373, 17 S.Ct. 360, 41 L.Ed. 750, wherein there is set out by the first Justice Harlan an extremely clear and informative statement involving the burden of proof in such cases.

mony of Dr. Katz. In the only material areas of the testimony, Dr. Morrison merely states he cannot give an opinion as to whether defendant knew his act was morally right or wrong, as to whether he understood the nature and possible consequences of his act, and as to whether he could have controlled his actions had he realized they were wrong. In connection with the latter he suggests that this ability would be somewhat impaired by a serious mental disturbance.

■ We have heretofore held the jury must determine the credibility of expert witnesses and that such evidence should be weighed as against other testimony and along with it, or that it may be entirely disregarded, State v. Velsir, 61 Wyo. 476, 159 P.2d 371, 377, 161 A.L.R. 220. In the Velsir case, however, after statement of this general rule this court held that expert medical testimony as to the cause of death was indispensable. The effect of the holding was that it was necessary for the State to sustain its burden of proof by such expert testimony. We are not prepared to say that expert testimony in cases of this kind must always be given complete credence or cannot be completely disregarded, nor do we suggest a trial by experts. Each case must be determined on its facts. However, the legislature of this state has recognized and conceded the validity and probative force of psychiatric opinion as applied to cases of this character when it provided in § 7–241(C) (iii), W.S. 1957, 1971 Cum.Supp., that when a defendant is confined pursuant to a finding of "not triable by reason of present insanity," the superintendent of the State Hospital may certify that he is able to stand trial and the sheriff must return him in order to be brought to trial. Under § 7–241(C) (ii), had the State Hospital report found defendant was able to stand trial he would have been placed on trial based upon that finding.

■ It is improper for juries to arbitrarily disregard such expert testimony, Brock v. United States, 5 Cir., 387 F.2d

254, 257; Mims v. United States, 5 Cir., 375 F.2d 135, 143. Opinions of experts must depend for their validity upon the facts and chances for observation had by the experts for reasons upon which they are based, Mims v. United States, supra; State v. Holt, 22 Utah 2d 109, 449 P.2d 119, 120–121. There is no suggestion by the State in either brief or argument that the opinions of Drs. Robertson, Katz, or Morrison are based on other than observation or actual facts, nor was any successful impeachment accomplished upon any of these witnesses. Dr. Katz, because of his position, had an especially good opportunity to examine and acquaint himself with the defendant and his condition. The question of whether a jury may completely ignore psychiatric testimony and depend solely upon lay testimony is dependent upon the real strength of defendant's showing, Hopkins v. United States, 107 U.S.App.D.C. 126, 275 F.2d 155, 157–158; Wright v. United States, 102 U.S.App.D.C. 36, 250 F.2d 4, 7, 9; and where there is substantial evidence, as in this case, the proof must be closely examined. We find this statement in the Wright case, supra, 250 F.2d at 9–10, which seems particularly apropos:

"Although the testimony of lay witnesses may be competent evidence on the issue of sanity, it does not follow that, in the face of a substantial showing of insanity, the Government may send the issue to the jury simply by having two policemen testify, 'He looked all right to me.' * * *"

It has been suggested that when procedures such as ours which follow a plea of insanity prior to trial have been adopted this is indicative of a virtual requirement there be expert testimony on the issue of insanity, 7 Wigmore on Evidence, § 2090(c), p. 462 (3d Ed.). In a case decided in 1921, State v. Wade, 96 Conn. 238, 113 A. 458, 462, there appears this statement insofar as it affects the matter of an insanity plea:

"Medical expert evidence is indispensable as an aid in the administration of justice."

If this were true over fifty years ago it can be but doubly so now as all sciences have moved greatly forward during this period.

Although we refer to Wyoming as having adopted the M'Naghten Rule, in at least two cases a modification has been suggested by this court, State v. Riggle, 76 Wyo. 1, 298 P.2d 349, 367, rehearing denied, 76 Wyo. 1, 300 P.2d 567, certiorari denied 352 U.S. 981, 77 S.Ct. 384, 1 L.Ed.2d 366; Flanders v. State, 24 Wyo. 81, 156 P. 39, 44, rehearing denied 156 P. 1121, by the inclusion of the so-called "irresistible impulse" or "uncontrollable act" test. This case was further tried upon that theory and the jury was instructed upon the "irresistible impulse" test.

■ Dr. Katz firmly asserts that defendant could not have controlled his actions had he been accountable under the tests in the M'Naghten Rule, and Dr. Morrison refuses to express an opinion thereon.

Although it is not alone proof of insanity, the enormity and unnaturalness of the crime is a circumstance not to be isolated from the other facts and is occasion for closer scrutiny of defendant's mental condition, Kiernan v. State, 84 Tex.Cr.App. 500, 208 S.W. 518, 519. The lay testimony of the three Billings officers as to defendant's behavior and recall of the facts of this murder must be examined closely to see if there is substantial credible evidence. This court must attach some significance to the fact that all three officers apparently thought defendant a crank or that he had escaped or walked away from the V. A. Hospital. Admittedly they had no acquaintance with defendant. Their characterization of his conduct as normal must be taken as measured on the standard of people generally. The acquaintance and time of observation by lay witnesses is of much importance, Hopkins v. United States, 107 U.S.App.D.C. 126, 275 F.2d 155, 157; McKenzie v. United States, 10 Cir., 266 F.2d 524, 526–527, and has even been said to be necessary.

It is almost a universally recognized rule that adjudication of insanity raises a presumption of a continuing state of this condition, but an adjudication is not necessary to raise this presumption. As stated in State v. Garver, 190 Or. 291, 225 P.2d 771, 777, 27 A.L.R.2d 105:

"The question whether there is a legal presumption that insanity continues has been before the courts of this country many times. As stated in Weihofen's 'Insanity as a Defense in Criminal Law', p. 164:

" 'The courts of a score or more of jurisdictions have said that when permanent, chronic, or continuous insanity is once proved to have existed at some time prior to the alleged crime, it will be presumed to have continued, and to have existed at the time of the alleged crime, unless the contrary is proved. This presumption arises especially upon proof of a prior adjudication of insanity, by proceedings de lunatico inquirendo, etc., but the cases do not seem to limit the rule to such proof; the presumption seems to hold, by whatever evidence the prior insanity may be proved.' "

See also In re Dennis, 51 Cal.2d 666, 335 P.2d 657, 661. This rule has also been followed in a civil case in this state, In re Ingram's Estate, Wyo., 384 P.2d 1020, 1021. We find no evidence, substantial or otherwise, which was directed at this presumption. The testimony of the Billings police officers from their short period of contact three days after the incident can hardly be deemed to raise any conflict in this area.

In connection with our examination of this case we have read the Mississippi case of Gambrell v. State, 238 Miss. 892, 120 So.2d 758, where there was much lay testimony of abnormal behavior along with the opinion of one psychiatrist as to defendant's insanity. The State in that case introduced six lay witnesses who testified as to defendant's normal behavior at various times prior to the murder. Some of these witnesses had had little opportunity to observe defendant. The State also introduced an expert witness who had not examined defendant but testified defendant's psychiatrist had not taken enough time to

make a proper diagnosis, although he did not deny its correctness. It was held in that case the State had failed to meet its burden. The case further suggested that the verdict was probably based upon an instruction from which the jury could infer defendant would be released. This might have motivated the jury to its decision in this case.

In another case, Douglas v. United States, 99 U.S.App.D.C. 232, 239 F.2d 52, 59, we find the following:

"* * * 'their [the jury's] judgment should not be disturbed on the ground it is contrary to expert psychiatric opinion.' [Citation.] We agree, but this is not authority for disregarding expert testimony. It must be considered with the other evidence, not arbitrarily rejected. A jury may not be upheld in arbitrarily convicting of crime. We as the reviewing court must be able to say that the result is rationally consistent with the evidence, measured by the required degree of proof. * * *"

In the case from which the preceding quotation is taken the prosecution rested solely for its burden of proof upon testimony of the robbery victim and the police officers who arrested Douglas, all agreeing he talked normally, seemed fully aware of what he was doing, and gave no indication of any delusions.

From what has been said it is our view that the State in this particular case failed to produce sufficient "substantial credible evidence" to sustain its burden and this case must therefore be reversed.

This case exemplifies that society might better protect itself by a revision of our present laws and procedure when a defendant asserts the plea of insanity upon the trial of a case. This court directs that the defendant be returned to the District Court of Sheridan County and that by virtue of § 7–242(b), W.S.1957, the county attorney file a petition and arrange a hearing for determination of the sanity or insanity of this defendant.

Reversed and remanded with directions.