**Frank GERARD, Appellant
(Defendant below),**

v.

**The STATE of Wyoming, Appellee
(Plaintiff below).**

No. 4150.

Supreme Court of Wyoming.

June 22, 1973.

———◆———

Tim Watt, Gillette, Vincent A. Vehar, Evanston, for appellant.

Clarence A. Brimmer, Atty. Gen., Bert T. Ahlstrom, Jr., Asst. Atty. Gen., Cheyenne, for appellee.

Before PARKER, C. J., and McEWAN and McINTYRE, JJ.

Mr. Chief Justice PARKER delivered the opinion of the court.

On November 3, 1969, Frank Gerard was charged with first degree murder of Ronald Jones. He waived preliminary hearing and at arraignment before the district court with appointed counsel pleaded not guilty, not guilty by reason of insanity at the time of the commission of the alleged offense, and not triable by reason of present insanity. He was ordered by the court to be sent to the Wyoming State Hospital for examination and evaluation. On December 15, 1969, that hospital's associate superintendent, Dr. Charles J. Katz, informed the court that Gerard was then psychotic, was psychotic at the time of the commission of the alleged offense, and was unable to assist counsel in the preparation of his defense. He further reported that the examination had been completed and that Gerard would be released "by complete discharge as with psychosis—insane and returned to the jurisdiction of the court." In a December 22, 1969, amplifica-

tion of the December 15 report, Dr. Katz stated, Frank Gerard is dangerous; he may be properly classified psychiatrically in the group of psychotic disorders as: Other paranoid state, 297.9. His illness is chronic, resistant to treatment, and prone to become more fixed and inclusive."

In May of 1970 counsel for the parties stipulated that venue be waived for the limited purpose of holding a hearing as to Gerard's capacity to stand trial. On September 10 the court commissioner in Uinta County order involuntary hospitalization on the ground that Gerard was mentally ill and likely to injure himself and others if not cared for in the hospital. Apparently Dr. William D. Pace, successor to Dr. Katz as Associate Superintendent of the Wyoming State Hospital, on June 2, 1971, certified Gerard was competent to stand trial; but following pretrial conference November 12, 1971, the trial judge ordered a Sheridan psychiatrist and the Wyoming State Hospital to examine Gerard and report with particularity as to his competency and capacity to stand trial. Dr. Pace wrote the court on January 18, 1972, that Gerard had been examined in September 1970, found competent to stand trial, and that such situation continued at the time of the letter. Thereafter the defendant was tried by a jury, beginning April 17, 1972, and found "guilty of murder in the first degree * * *; without capital punishment, and * * * sane at the time of the commission of the offense."

Defendant has appealed, urging prejudicial error of the court (1) in limiting his attorney's voir dire examination of jurors by directing that the panel be asked general questions as a whole and not allowing examination of each juror individually, (2) in limiting defendant's testimony in regard to a communist conspiracy and denying him the right to testify concerning specific incidents believed by the defendant to be a part of the communist conspiracy, which tended to show defendant's insanity, and (3) in denying defendant's motions for acquittal when the State failed to prove be-yond a reasonable doubt that defendant was sane at the time of the commission of the offense after defendant had proved by credible, undisputed, and unrebutted testimony that he was insane at the time of the offense.

### The Voir Dire Examination

Defendant presents no cases to support his argument that the court's limiting voir dire examination to general questions of the panel was prejudicial error "destroying or impairing the rights of challenge for causes and the selection of a fair and impartial jury." Instead, he contents himself with references to quotations from the Wyoming Constitution, Wyoming Rules of Criminal Procedure, and various general authorities, none of which bear on this specific point. The questions, which brought about the limitation, related to the State's burden of proof in a charge where the defense was insanity and covered various aspects of the situation, including jurors' acquaintance with writings of psychiatrists and psychologists with queries as to the attitude of those jurors addressed. While it is not possible, or at least not practical, to enunciate rigid rules concerning the latitude which should be allowed counsel when interrogating prospective jurors, there is universal agreement that the matter. is within the sound discretion of the trial court. State v. Guffey, 205 Kan. 9, 468 P. 2d 254, 259; Lowther v. United States, 10 Cir., 455 F.2d 657, 666. We see no reason why defendant's counsel after his request had been denied could not have couched general questions to the panel in such a way as to elicit answers from any juror who indicated he was not open-minded. As is said in 2 Wright, Federal Practice and Procedure: Criminal § 381, p. 27, "Too often counsel regard it as an opportunity to obtain a jury sympathetic to their position." This is an instance where the words of Judge Alexander Holtzoff are particularly applicable, " 'The defendant is entitled to a fair and impartial jury. He is

not entitled to a sympathetic jury.' "[1]  We take the trial court's direction regarding future voir dire questioning to have meant that the interrogations should be general to the panel so far as was reasonable, and we find no error in that ruling.

### Limiting Defendant's Testimony Concerning Communist Conspiracy

Defendant took the stand and at some length testified in response to his counsel's questioning about communist conspiracies which he believed to be linked with the decedent and which brought about the death for which he was charged.  After considerable attention had been devoted to his state of mind and fears, the testimony filling many pages (the State asserting it to have required one and one-half hours of time), the following ensued:

"Q  What specifically happened aboard ship which tied into the incident of Ronald Jones's death?  A  That refers back to the federal officer, what I told him.

"Q  You wanted him to—  A  Investigate this incident.

"Q  Investigate what?  A  This incident that took place in Port Hueneme, California, on this naval base, which has been confirmed.

"Q  Okay, what was that incident?

"MR. BRORBY [Deputy County Attorney]:  I'm going to object to that question as being incompetent, irrelevant and immaterial."

The objection was sustained and defendant's counsel made an unsuccessful offer of proof concerning various events relating to communist plots and purporting to show the state of defendant's mind at the time of the trial and perhaps at the time of decedent's death.

■ Defendant now argues that it was prejudicial error for the court to so limit his testimony, asserting on the basis of State v. Martin, 102 Ariz. 142, 426 P.2d 639, 645, that the jury in determining criminal responsibility when insanity is pleaded as a defense is entitled to have the entire picture of the defendant.  We are inclined to think that counsel misinterprets the Martin case, as well as the general citations on the subject, which are applied too literally.  Essentially the purport of the Martin case is that evidence which may have a bearing on the questions of whether the defendant understood the nature or quality of his act and whether he knew right from wrong will not be deemed too remote for the jury's consideration.  We do not consider it as authority for according a defendant a right to state without limitation his philosophy and events which led up to it.  In the instant case, previous to the court's limitation, defendant had expressed quite fully his communistic-plot fear and in so doing had been very repetitious.  The description of his testimony by his own counsel as "rambling" indicates little question in that regard.  The jury, if it believed what he said, could scarcely avoid having been impressed that his life had long been under the shadow of fear that sooner or later communistic planning would overrun and outdo him.  Thus, anything that defendant could have added to this impression by discussion of matters which had happened long since at sea while he was in the merchant marine would at best have been merely an exercise in tautology.  That the trial court has wide discretion respecting examination of witnesses is too well established to justify discussion.  Gajewski v. United States, 8 Cir., 321 F.2d 261, 268, certiorari denied, 375 U.S. 968, 84 S.Ct. 486, 11 L.Ed.2d 416; 2 Wharton, Criminal Evidence § 408 (13 Ed.); 98 C.J.S. Witnesses § 317.  We find no abuse of discretion in the court's ruling concerning this aspect.

### Evidence of Defendant's Sanity

The main thrust of the appeal seems to be the contention that after defendant had introduced expert testimony of his insanity the State, which then had the burden of proving his sanity beyond a reasonable

---

1.  2 Wright, Federal Practice and Procedure:  Criminal § 381, p. 27, n. 4.

doubt, presented no substantial evidence to satisfy its burden. In that regard, the record does bear out defendant's witnesses, Drs. Pace and Katz, to have testified that in their respective opinions the defendant was insane at the time of the commission of the alleged offense, which views the State did not *thereafter* controvert. In his argument on this phase of the appeal, defendant relies on Reilly v. State, Wyo., 496 P.2d 899, 902–905, and says that the evidence in that and the instant case is practically the same except that here no lay testimony was directed to the issue of defendant's sanity at the time of the offense.

■ The argument on this view is challenging and if valid might well be cause for reversal of the instant conviction. Hence, it must be scrutinized with care. An examination of the two cases discloses, however, that over and above the fact that in Gerard the State presented no testimony concerning sanity *after* the psychiatrists had given their respective views there are numerous differences. For instance, no one saw Reilly immediately before or after the fatal occurrence and lay testimony regarding his mental condition related to a time several days afterwards. Moreover, it was quite desultory and indefinite. An entirely different situation obtained in the instant case since numerous witnesses saw and talked to Gerard immediately before the shooting and one thereafter. All such testimony had a direct relation to his state of mind at the time; and as has been previously indicated, Gerard took the stand in his own behalf and talked at length about his state of mind—not only at the time of the shooting but long previously. Since the jury was fully and properly instructed, these facts were within its consideration in the determination concerning the defendant's sanity. Without receding in any respect from our pronouncement in Reilly that the evidence of defendant's insanity erases the initial presumption of sanity, we find little to substantiate counsel's misapprehension of the lay testimony which bore on defendant's sanity at the time of the offense.

The record discloses significant testimony from the various eyewitnesses as to events immediately preceding the shooting. On September 18, 1969, Frank Gerard, the defendant; Walter Plenty Chief, Jr.; Kenneth Yelich; Richard Howard; and Daniel B. Schouten, employed by a construction coumpany, lived together in a company bunkhouse at a site in Gillette, Wyoming. About five o'clock in the afternoon on the eighteenth Gerard, Howard, and Plenty Chief bought groceries and Gerard bought a pint of whiskey. They ate a meal at their bunkhouse and together with the other men drank the pint of whiskey, after which another bottle or two were procured and consumed. Gerard and Plenty Chief became involved in a heated argument, which stopped just short of violence. During the argument, Schouten left the bunkhouse to get their foreman, the deceased (who had also been drinking); but by the time the foreman came to the bunkhouse the argument between Gerard and Plenty Chief had been settled. An altercation then ensued between the foreman and Gerard. The defendant's version was:

"* * * and Ronald Jones came over to the bunkhouse and came storming in.

"Q Where were you when he came in? A In the vicinity of my bunk. I don't remember if I was sitting on it or if I was standing.

"Q What happened after he came in? A Well, he come in and he asked, he said, 'What the hell's going on?' and it wasn't too belligerent a manner really, you know. I mean, I wouldn't say the man was angry at the outset, really angry. I mean, this is my consensus. I wouldn't say he was really angry at the outset. But he said rather intensely, let's put it that way, 'What the hell's going on?'

Q What happened next? A I forget now whether Chief retorted first or myself, but I remember myself telling the man that everything, you know—there was a little hassle, there was a misunderstanding or words to that effect, and

that you know 'It's all quieted down. Everything's okay,' you know. So, I was in the process of taking off my clothes at the time he walked in, and, well, during the time the conversation, you know, was taking place, I headed for my bunk and, if I remember correctly, I had my shoes off, my shirt off, and the man approached the bunk and he told me, he says, 'You're a troublemaker.' And I said, 'No,' I said, 'how do you come to that conclusion?' He says, 'This Indian is the best man that I have.' He says, 'What the hell are you,' you know, 'arguing with him for?' I said, 'Look,' I said, 'everybody's been drinking, including myself,' I said, 'so an argument ensued.' I said 'It's not any more my fault than it is his.' And I said, 'Besides, the argument's quieted down anyhow, so,' I said, 'why is it you're having an interest?' And he said something to the effect you know, 'Don't get smarting off.' And I says, 'I'm not smarting off.' I says, 'You're the foreman,' you know. I says, 'You're the boss. You run the project.' I says, 'I'm not getting smart with you.' I said, 'I accept the fact that you're the boss,' I says, 'and I accept the fact,' you know, 'that if you want to know what transpired,' I says, 'I'll tell you.' So then somewhere along in that area he turned around and he asked Walt, you know, what had transpired, and Walt told him, as near as I can remember anyhow, he told the man that I had said that, you know, he was on welfare.

"Q What happened next? A I intervened and I said—like I say, I was standing over by the bunk, and I intervened and I said—'No, that's not what I said, sport,' and I told him what I had said previously. And Mr. Jones turned around and said to me, he says, 'You're a smart ass,' you know, 'a troublemaker.' So, I told the man, I says, 'Look, I'm intending leaving this week anyhow just as soon as I,' you know, 'acquire my check,' I said, 'so why not just—I'll come back for my check in the morning.' He says, 'You better hit that bed,' he says, 'or get the

hell out, pack your clothes and get the hell out.' I said, 'You're on.' So, I turned around to pack my clothes and, the next thing I know, bam, I'm down on the bed and up against the wall and I saw the fist coming, but not in time to get out of its way or to block it. Anyhow, I wound up on the bed against the wall * * *."

Defendant explained in detail his version of the fight, how he was clubbed by Jones' fists and when Plenty Chief also attacked him, twice kneed in the groin. He continued:

" * * * I tried to go backwards and swing with them you know, to release some of the pressure, but there was two of them on me. And I don't know how far back down I was when my fingers popped, but I felt them pop and, when they did, I yanked my hand back, you know, to pull away and I took a look at my hand and I thought to myself, Jesus Christ, what the hell did he do that for, you know. I couldn't understand and I really could not understand why in the hell he did it.

"Q What did you do next? A I just pushed my way between them.

"Q Where did you go? A I went out the door."

Gerard said he remembered nothing after that until he was about a half-block from a Gulf station where he reported a shooting.

According to Plenty Chief the deceased struck Gerard along his cheek "slapped him off of the bunk * * * he fell * * * and I guess * * * knocked three fingers out of joint. Mr. Gerard said that his hand was hurting. He showed it to Jones * * * and * * * kept saying things about his hand so he [Jones] just told him to leave." Plenty Chief said Gerard left, later called Jones to come out, and there were shots. When Plenty Chief left the bunkhouse he found the deceased lying face down on the ground. As Plenty Chief was on the ground with the de-

ceased, he noticed the opened trunk of Gerard's car.

Schouten testified that after Gerard left the bunkhouse he knew he went to his car because he heard a trunk open and that when Gerard called the deceased one of the men said, " 'You'd better not go out. He might have a gun.' "

Mrs. Jones was waiting outside in a truck for her husband and saw the defendant leave the bunkhouse, go to the side of a car, and then to the back of the car. She testified: "[Gerard said] 'Hey, Ron.' * * * Ron walked to the door of the bunkhouse and * * * said, 'Ho,' or 'Hey,' or something like that * * * and Mr. Gerard said, 'C'mere a minute.' And Ron says, 'Where are you at? I can't see you.' And when Ron said this, he started walking out the doorway down this shaft of light that was made from the door being open. And Mr. Gerard in the meantime had started walking from in back of the car and was just almost to the shaft of light and then he stepped into the shaft of light and he said, 'Here, you sonofabitch,' and then he shot. * * * when he [Jones] reached Mr. Gerard he put his hand in front of him * * * and then he fell backward into the dark—it was very dark that night—but he fell into the shadow of the building, which made it even darker."

Jim Wineteer, who was a gas station attendant at the Gulf station, a block and a half from the bunkhouse, heard what he thought were five shots and a woman screaming, and about twenty minutes later the defendant arrived at the station ("dressed normal and he had bloodstains on his shirt, and the two fingers on his right hand were dislocated or they were bent clear back"), asking for change for cigarettes. He testified:

"Q And what, if anything, did you say? A I give him his change and then I asked him what happened or if he knew what happened.

"Q And what did he say? A He said, 'A guy's been shot.'

"Q What then happened? What did you do? A Well, he sat down in the chair there for a little while. And then I had called the police before that, or somebody else had already called it in, so they was on their way. And then he sat down in the chair. And a bunch of police cars and stuff pulled up out on the street there and I walked out to the policemen there and told them there was a guy sitting in the office that said a guy had been shot. * * *

"Q Did they then take him into custody? A Yes. He was walking out of the station and they took him then."

The record is replete with evidence from various eyewitnesses as to the events immediately preceding and following the shooting. This the jury was entitled to consider on the issue of defendant's sanity at the time of the offense. We noted in Reilly, supra, that neither the trial court nor this body should substitute its opinion for that of the jury, whose finding of fact should not be interfered with if there is any substantial evidence to support it. As the court said in People v. Krugman, 377 Mich. 559, 141 N.W.2d 33, 35, "The jury is the ultimate judge of defendant's sanity at the time of the crime, and * * * since it had before it evidence of defendant's behavior and state of mind upon the basis of which it could have found defendant sane at that time, it was not bound by the expert opinion testimony of the doctor. * * *" We again recognized this view in Jarrett v. State, Wyo., 500 P.2d 1027, 1031–1032, involving a murder charge, where we held that the trial court correctly denied a motion for acquittal notwithstanding the testimony of psychiatrists that defendant had suffered from a mental disease or disorder, our position being that the other evidence which had been adduced was sufficient to show that defendant knew and understood the nature and probable consequences of his act, knew that it was morally wrong or forbidden by law, and had sufficient will power to control his acts. As Mr. Chief Justice McIntyre

said in Rice v. State, Wyo., 500 P.2d 675, 676, "A jury can always disregard the testimony of an expert if the jurors find it to be unreasonable."

Careful analysis of the record in this case under the above outlined rules discloses ample evidence to support the finding of the jury that defendant was sane at the time of the crime. Accordingly, the judgment of the trial court must be affirmed.

Affirmed.

GUTHRIE, J., not participating.